## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

**MARTHA J. DURHAM,**                          **CASE NO.:**

        **Plaintiff,**

                                    **JUDGE:**

**v.**

**SEACREST COUNTRY DAY SCHOOL,**             **COMPLAINT FOR AGE**
**NANCY O'HARA AND KEVIN**                   **DISCRIMINATION, RETALIATION,**
**ASPERGREN.**                               **INTENTIONAL INFLICTION OF**
                                             **EMOTIONAL DISTRESS,**
                                             **NEGLIGENT HIRING AND**
        **Defendants.**                     **NEGLIGENT RETENTION**

                                    **JURY DEMAND ENDORSED**
                                    **HEREON**

## JURISDICTION

1.  This is an action for damages for discrimination and retaliation under The Age Discrimination in Employment Act, 29 U.S.C. § 621, as amended ("ADEA"), the Florida Civil Rights Act, F.S. § 760.01 *et seq*, ("FCRA") and F.S. § 448.01 *et seq*., Retaliation under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e-3, *et seq.,* ("Title VII"), and common law claims of Intentional Infliction of Emotional Distress  and Negligence arising from the facts comprising claims under the ADEA and Title VII.

2.  Jurisdiction in this Court is proper because the claims and allegations herein are governed by the laws of the United States (28 U.S.C. § 1331) and because the state law claims are so related to the federal claims that they form part of the same case and controversy (28 U.S.C. § 1367).

3.  Venue in this Court is appropriate because all of the Defendants operate/reside in Collier County and all claims arose out of acts and omissions occurring in Collier County.  (28 U.S.C § 1391 (b)(1) and (2)).

4.  Plaintiff has exhausted her administrative remedies.  She was issued a "Right to Sue" letter by the Equal Employment Opportunity Commission and the Florida Commission on Human Rights on August 30, 2022.

## PARTIES

5.  Martha J. Durham is a former employee of Defendant Seacrest Country Day School ("Seacrest").

6. At all times relevant to the claims in this Complaint, Seacrest was, and continues to be a Florida Non-Profit operating a private school for grades Pre-kindergarten through Twelfth Grade located at 7100 Davis Boulevard, Naples, FL 34104.

7. At all times relevant to the claims in this Complaint, Seacrest was superintended by a Board of Trustees (BOT) consisting of eleven Members and an Executive Board ("EBOT") consisting of eight members including the Head of School.

8. At all times relevant to the claims in this Complaint, Defendant Nancy O'Hara ("Chair O'Hara') was the Chair of the BOT and the EBOT.

9. At all times relevant to the claims in this Complaint, Defendant Kevin Aspegren ("Aspegren") was the Interim and, then, Permanent Head of School and a Member of the EBOT.

10. For purposes of the claims in this Complaint all Defendants meet the definition of an employer pursuant to the FCRA, Title VII and F.S. § 448.101(2).

## CHRONOLOGICAL STATEMENT OF FACTS

11. The Plaintiff, Martha J. Durham ("Durham") worked at Seacrest for 21 years, specifically in the area of Human Resources during her last 14 years.

12. In August 2015, Durham was also asked to take on Facilities Manager and Safety Officer responsibilities for Seacrest.

13. In October 2015, Durham was promoted to Director of Operations overseeing Human Resources, Facilities, Safety and Budget.

14. In her role in Human Resources, Durham was responsible for, among other things, employment law compliance.

15. Because of her role in Human Resources, Durham has detailed and credible knowledge of all employee information including: credentials, performance, discipline, contracts, compensation, recruiting, staffing, legal compliance and complaints made by or against Seacrest Staff.

16. Because of her role as Director of Operations, Durham has detailed and thorough knowledge of Seacrest's Financial data including budgets, expenditures and shortfalls during her tenure at Seacrest.

17. Durham provided monthly reports to the BOT on Human Resources, as well as Budget/Facility and Safety Matters.

18. At no time during her tenure at Seacrest was Durham ever disciplined or reprimanded but, instead, was promoted numerous times culminating in her positions as Human Resources Director and Director of Operations.

19. Until February 2020, all feedback regarding Durham's performance was positive with no hint of dissatisfaction by the BOT or the Head of School.

20. In February 2020, Aspegren was hired by the BOT as Interim Head of School with the expressed intent among the members of the BOT that they would conduct a national search for a Permanent Head of School.

21. The BOT did not do any employment or personal reference checks prior to bringing in Aspegren.

22. Had the BOT done any inquiry at all, they would have learned of the conflict Aspegren created at his prior employer, the Florida Institute of Technology, when he raised the salaries of the Fundraising Staff while budget restrictions had been imposed for staff with direct student contact.

23. When Aspegren took over as Interim Head of School, his ex-wife was employed by Seacrest as its Development Officer which then made Aspegren his ex-wife's direct supervisor.

24. After Aspegren was hired as Interim Head of School, Aspegren never met with Durham to discuss her scope of responsibilities or pressing budget matters.

25. On March 27, 2020, without any prior notice to, or discussion with Durham, Aspegren, in a group email, fired Durham's entire maintenance staff, except one employee, purportedly for COVID reasons.  Half of the staff Aspegren fired were over 50 years old.

26. Durham did not become aware of the March 27, 2020 group termination until a crying staff member showed Durham the group email.

27. After March 27, 2020, Aspegren refused all requests by Durham to discuss facilities' repair and maintenance needs or budget matters.

28. In April, 2020, Durham complained to Chair O'Hara about Aspegren's refusal to meet with Durham to discuss human resources, facilities or budget matters.  Chair O'Hara's response was that Durham needed to talk to Aspegren.

29.  Chair O'Hara offered no assistance to accomplish getting Aspegren to meet with Durham, nor did Chair O'Hara express any particular concern about Aspegren's repeated refusals to meet with Durham.

30. Per Chair O'Hara's advice, every Monday in April and May 2020, Durham requested a meeting with Aspegren.  All of Durham's requests to meet were refused by Aspegren.

31. In May 2020, without notice to or discussion with Durham, Aspegren promoted the 46-year-old facilities employee on Durham's Team to "Facilities Manager."  Prior to the promotion, Aspegren instructed the employee being promoted that he should no longer report to Durham and not say anything to her.

32. Neither before or after the event described in the foregoing paragraph, did Aspegren tell Durham that Facilities Management was being removed from her obligations as Director of Operations or that Durham's responsibilities as Director of Operations were being modified or that Durham would no longer be the Director of Operations.

33. Instead, Aspegren simply refused to acknowledge or work with Durham in her capacity as Director of Operations and begrudgingly acknowledged Durham as the Human Resources Director.

34. When Aspegren started at Seacrest, the positions of Head of Lower School, Head of Middle School and Head of Upper School for the 2020/2021 school year were all vacant.

35. In June 2020, Aspegren surprised everyone attending a Leadership Meeting to address COVID issues by announcing that he had selected Heads of all three schools.

36. Aspegren made a unilateral decision to promote three younger and less qualified employees to Senior Management positions without consulting with or notifying Durham whose responsibilities included Recruiting and Hiring.

37. Aspegren made these appointments without interviewing anyone including the Heads he promoted.

38. Aspegren made these appointments without conducting any outside searches or considering applications submitted by existing employees.

39. Aspegren failed to consider more senior candidates who were more experienced, better educated and well respected by parents and staff than the Heads Aspegren appointed.

40. For the Head of the Lower School, Aspegren chose a 44-year-old female Volleyball Coach and part-time Admissions Counselor who had not taught in a classroom at Seacrest, without giving any consideration to:
    a. a 62-year-old Lower School Teacher with Seacrest for 16 years who was extremely well-respected and who had applied for the position of Head of Lower School; or
    b. a 68-year-old Lower, Middle and Upper School Teacher with a PhD in Educational Leadership and Curriculum who wrote the Seacrest Curriculum for over ten years.

41. For the Head of Middle School, Aspegren chose a 39-year-old female PE and Health Teacher without giving any consideration to:
    a. a 65-year-old female who was the longest serving teacher in the Middle School (14 years) and well respected by parents and staff;

    b. a 70-year-old male veteran middle school teacher and coach who during his tenure made a significant and positive impact on Seacrest; or

    c. the 68-year-old teacher with the PhD in Educational Leadership and Curriculum.

42. For the Head of Upper School, Aspegren chose a 43-year-old male Upper School Teacher who had been with Seacrest less than 4 years without giving any consideration to:

    a. a 56-year-old teacher with the Upper School for 19 years with a PhD, who served as the English Department Chair, acted as Dean of Student Life and was well respected by parents and students;

    b. a 78-year-old Department Chair who served as Dean at former schools and was a respected leader in the Navy;

    c. a 69-year-old Teacher with Department Chair experience; or

    d. the 68-year-old teacher with the PhD in Educational Leadership and Curriculum.

43. On June 10, 2020, Durham, again, expressed concerns to Chair O'Hara about Aspegren's non-communication and the potential legal claims which could be brought against Seacrest due to Aspegren's actions. Chair O'Hara's advice to Durham, again, was that she should talk to Aspegren.

44. Based upon Chair O'Hara's aforementioned response, on June 11, 2020, Durham asked Aspegren for a meeting. Aspegren responded "not now." Durham attempted numerous times on June 11 and 12, 2020 to meet with Aspegren, to no avail.

45. In June 2020, Durham also opined to Chair O'Hara that if Aspegren was named Permanent Head of School, Seacrest's exposure for potential legal claims would be even greater.

46. On July 10, 2020, Aspegren left a note on his door directed to the Hispanic Cleaning Staff which stated: "Cleaning Crew- Do Not Enter My Office EVER! And Return The Items You Took."

47. Aspegren's note caused the Cleaning Staff, which had never before been accused of "stealing" anything, to fear for their jobs.

48. In July 2020, Aspegren directed that certain portable classroom units which had incurred mold damage as a result of Hurricane Irma, (the "Portables"), be opened to staff and teachers as classrooms.

49. Prior to Aspegren's decision to open the Portables, Durham had advised Aspegren that a mold test should first be performed documenting that the Portables were free of mold before housing students and staff in the Portables.

50. Aspegren ignored Durham's advice and opened the Portables without any mold testing.

51. In August 2020, Aspegren interrupted a New Employee Orientation that Durham was conducting and insisted that Durham "stop talking" which caused Durham great embarrassment.

52. In an October 2020 BOT Meeting, the 55-year-old Business Manager, reporting to the BOT, attempted to express her concerns that Seacrest's Budget and Cash Flow were not sustainable due to increased salaries and expenses and decreased development money. Each time the Business Manager tried to speak, Aspegren ordered her to stop talking. Neither Chair O'Hara nor any of the other BOT members in attendance expressed any concern when Aspegren stifled the Business Manager, nor did they ask any additional budget questions.

53. On October 12, 2020, Aspegren summoned the Business Manager to a meeting.  Before the Meeting, the Business Manager expressed to Durham, in her capacity as HR Director, that she was nervous about meeting with Aspegren alone.

54. After her October 12, 2020 meeting with Aspegren, the Business Manager reported to Durham that, despite her request, Aspegren refused to keep the door open during the meeting, Aspegren berated the Business Manager for her attempted report to the BOT about budget and cash flow concerns, and that a heated argument ensued ended by Aspegren ordering the Business Manager to get out of his office.

55. The Business Manager resigned that week.

56. In October 2020, Seacrest lost a promising candidate that Durham recruited for College Counselor (approximately 59-year-old) who, prior to his meeting with Aspegren, indicated he was ready to join Seacrest.  After the College Counselor candidate met with Aspegren, based upon Aspegren's disparaging remarks during the interview, the Candidate told Durham that while he wanted the position as College Counselor, he would not work for Seacrest if Aspegren was named permanent Head of School.

57. In October, 2020 Durham reached out to Chair O'Hara to express concerns about the opportunities Seacrest was losing regarding talented candidates as well as valuable employees due to Aspegren's behavior and discriminatory practices.  Durham specifically advised Chair O'Hara that Aspegren was putting Seacrest at risk for legal employment law and other claims.  Chair O'Hara's response to Durham was that she should have better procedures in place for the office.

58. On or about October 12, 2020, Durham was informed by a third party that Aspegren was taking over the College Counselor search.  Recruiting was part of Durham's historical duties as HR Director, however, Aspegren made no attempt to discuss his decision to take over recruiting for the position of College Counselor with Durham.

59. After denying the Staff a Cost-of-Living raise for the 2020/2021 school year, in November 2020, Aspegren gave his ex-wife a raise of $29,000.00 annually with a promise of an additional $20,000.00 more in July 2021.

60. Also in November 2020, at a time when Seacrest had more pressing staff and other needs that were going unmet for financial reasons, Aspegren authorized his ex-wife to hire two additional employees.

61. Prior to Aspegren being hired by the BOT as Permanent Head of School in December 2020, and afterward, Durham, in her capacity as Human Resources Director, repeatedly warned Chair O'Hara about potential discrimination liability, numerous illegal employment practices, and the questionable financial and development decisions Aspegren and his ex-wife were making without any oversight or supervision from the BOT.

62. In December 2020, despite legal and employment concerns raised by Durham to Chair O'Hara, the BOT voted to hire Aspegren as Permanent Head of School, without ever having conducted the national search the BOT had intended when naming Aspegren as the Interim Head of School or checking Aspegren's references.

63. On or about February 1, 2021, Aspegren, in the Upper School Common Room, yelled to Durham that she was an "idiot" in earshot of at least ten students and the Head of the Upper School, because Durham had allowed an employee to take two weeks of FMLA Leave to which the employee was legally entitled.

64. Also, on or about February 1, 2021, Aspegren, in the after-school car pick-up line, confronted the employee granted the FMLA leave and publicly accused her of seeking undeserved FMLA relief.

65. Durham requested numerous times to explain to Aspegren why the employee was legally entitled to FMLA leave.  Aspegren refused all of Durham's requests to talk.

66. Durham also spoke to the Seacrest's Acting CFO, twice, about the FMLA issue.  The CFO indicated he was aware of Aspegren's behavior.

67. Upon information and belief, the CFO also discussed Aspegren's behavior with Chair O'Hare.

68. At a Leadership Meeting in February 2021, Aspegren, without any discussion or explanation, ordered that the 68-year-old teacher with the PhD in Educational Leadership and Curriculum be fired at the end of the school year.  After that Aspegren instructed Durham to stop including the 68-year-old teacher in interviews for the Science Department stating that "she is gone anyway."

69. On March 24, 2021, in a memo to Aspegren and Chair O'Hara, Durham reported a complaint of racial discrimination, harassment and abuse submitted by an employee based upon actions and remarks of BOT member John Paz and his wife at a recent Fundraiser.

70. Durham had investigated the complaints and confirmed from witnesses, including parents, that John Paz and his wife had, publicly, made racially discriminatory remarks about certain other guests at the Fundraiser and harassed a Seacrest employee in the process.

71. Durham considered the incident and the employee complaint to be very serious given that the Paz's behavior was overheard and witnessed by guests and parents of Seacrest students.

72. Despite Durham's investigation of the facts and advice to Chair O'Hara and Aspegren about addressing the matter, no action was taken.

73. On or about April 1, 2021, Aspegren told Seacrest's Heads of the Lower and Middle Schools that Durham told Aspegren, personally, that Durham wanted to leave Seacrest and be paid out the rest of her contract.

74. Durham never told Aspegren that she wanted to leave Seacrest or even insinuated any such thing.

75. What Aspegren told the Heads of the Lower and Middles Schools was false.

76. On May 25, 2021, Aspegren received an email from a parent complaining that a 59-year-old Asian/Indian teacher acted inappropriately in suggesting that a student may have mental health issues.  Upon receipt of the email, with no further investigation, Aspegren told Durham and the Head of Upper School that Aspegren wanted to fire the Asian/Indian teacher.

77. The following day, on May 26, 2021, in a memo to Aspegren, the Head of Upper School and the acting CFO, Durham advised Aspegren, that due to fairness and employment discrimination concerns, Aspegren should, at the very least, conduct an investigation to understand all the facts.

78. Aspegren ignored Durham's advice and instructed Durham and the Head of Upper School to fire the Teacher with no further investigation.  The Teacher was terminated effective June 30, 2021.

79. Also on May 26, 2021, after receiving the cautionary memo from Durham about the Asian/Indian Teacher, Aspegren sent a group text to the Management Team reprimanding Durham for hiring a Science Teacher and telling Durham that she should not be making employment offers.

80. At the time of the May 26, 2021 reprimand, Durham was the Head of the Hiring Committee and her job, historically, included making offers to teachers who were approved by the Hiring Committee.

81. Per protocol, Aspegren had received an invitation to the Hiring Committee's May 24, 2021 Meeting to discuss the Science Teacher candidates and a copy of the Science Teacher's resume.  Although Aspegren accepted the Calendar Invite to attend the meeting, he never showed up to the meeting.

82. The Hiring Committee voted unanimously to hire the male Science Teacher.  In response, Aspegren expressed his anger that the Hiring Committee had not chosen an attractive female in her thirties who had applied and interviewed for the Position.  The Hiring Committee had ranked the candidate Aspegren wanted as third on the short list of Candidates.

83. Although Durham had historically, for years, been included in Seacrest Leadership Meetings, in May 2021, Aspegren re-scheduled a Leadership Meeting Durham was supposed to attend and deliberately omitted Durham from the re-scheduled Meeting Invitation.

84. In June 2021 Aspegren refused to meet with a 65-year-old Hispanic Groundskeeper who was fearful that he would be replaced by someone younger.

85. On June 4, 2021 (a Friday), Aspegren informed Durham that the following Tuesday she would be moving to a different office, away from the front, in order to move Aspegren's ex-wife and her team into Durham's office.

86. Also, on June 4, 2021, Aspegren deliberately deleted Durham's name from the Invite List for an upcoming Leadership Meeting.

87. On June 7, 2021, the Heads of School went to Aspegren asking him to reconsider moving Durham's office because it made Durham less accessible to the school Heads.  Aspegren refused and forced Durham to move.

88. On June 24, 2021 Aspegren directed Durham to terminate a Black, Haitian female who had just been hired by Durham and the Head of Upper School, to be the Administrative Assistant to the Upper School.

89. Prior to vetoing this Administrative hire, Aspegren did not involve himself with hourly staff hiring decisions.

90. At the time of the Administrative Assistant's hiring, the Head of Upper School expressed that it was critical to bring someone in quickly so the new hire could be trained by the departing Administrative Assistant who had resigned.

91. Durham timely hired the Candidate for less than the budgeted amount for the position.

92. When Durham informed Aspegren that an Administrative Assistant to the Upper School had been hired in the requested timeline and under budget, and added that the New Hire spoke Creole, Aspegren instructed Durham to immediately terminate the New Hire.

93. Immediately afterwards, Aspegren instructed the Upper School Leadership Team to develop a job description for the staff position of Administrative Assistant to the Upper School.

94. The Upper School Leadership Team did as instructed and developed a Job Description for the Upper School Administrative Assistant which mirrored the skills, education and credentials the Black, Haitian Female listed on her resume and exhibited in interviews.

95. Despite the overwhelming facts supporting the Black, Haitian Female for the position for which she was applying, Aspegren still refused to reconsider the firing of the Black, Haitian Female Candidate.

96. The position of Administrative Assistant to the Upper School remained unfilled through the summer of 2021 causing the Day-Care Staff concerns over the unsupervised desk at an open door.

97. On June 25, 2021, Aspegren attempted to replace the 55-year-old Brazilian female Director of the Baby Rays Program with a younger White female.

98. After the Asian/Indian teacher's termination, the Teacher requested a meeting with Aspegren to discuss the matter.  Aspegren responded to the Teacher on July 6, 2021 that no matter what the Teacher had to say, he was still fired despite Aspegren having received an unsolicited email from a parent dated July 3, 2021 supporting and defending the Teacher.

99. For the last four months of her tenure, Durham agonized over what was happening to Seacrest so much so that she sought therapy to help her cope.

100. On July 13, 2021, Durham submitted to Aspegren and the BOT, a four-page resignation letter ("Resignation Letter') detailing Aspegren's ageist and racist behavior, refusal to abide by or discuss employment law compliance and tendency to simply ignore staff over the age of fifty or with culturally diverse national origin.

101. Durham's Resignation Letter also outlined the increasing retaliation she suffered from Aspegren triggered by Durham's investigating, reporting and advice regarding the legal risks to Seacrest that could be caused by Aspegren's decisions as well as the racial discrimination and harassment complaints against the Paz's which went unaddressed.

102. No one ever responded to Durham's Resignation Letter.

103. After Durham left Seacrest, she diligently attempted to procure a professionally and financially comparable position in her field.  Despite numerous employment applications submitted by Durham, her efforts to find new employment resulted in a lesser paying job which Durham was forced to accept due to financial needs.

104. The Human Resources Director that replaced Durham at Seacrest is substantially younger than Durham by approximately nineteen years.

105. Durham was damaged both financially and mentally by having to work under intolerable conditions and the continuing apathy of the BOT.

106.    It was necessary for Durham to hire legal representation in order to seek redress against all Defendants.

## CAUSES OF ACTION

### COUNT I
### AGE DISCRIMINATION IN EMPLOYMENT
### (FEDERAL)

107.    Durham incorporates herein by reference paragraphs 1 through 106 of this Complaint.

108.    Durham is a member of a protected class, currently 63 years old.

109.    Durham worked at Seacrest for twenty-one years and was a member of the Senior Management Team.

110.    Durham, through her seniority, experience and training was fully qualified for her position as Director of Operations which included Director of Human Resources.  See paragraphs 11 through 19 of this Complaint (hereafter referred to as "Compl. par. __").

111.    From his arrival at Seacrest, Aspegren ignored Durham in her capacity as Director of Operations and, begrudgingly, tolerated Durham in her capacity as Human Resources Director.

112.    Early upon his arrival at Seacrest, Aspegren began exhibiting a propensity to favor younger employees over more senior employees without regard to the senior employees' qualifications, experiences and reputation among staff, students and parents.

113.    As the Director of Human Resources, Durham expressed concern to the Chair of the BOT ("Chair O'Hara") that Aspegren's pattern of ignoring older staff in favor of younger less qualified staff was putting Seacrest at risk for employment law claims.

114.    For herself, Durham also complained to Chair O'Hara that Aspegren's persistent refusal to communicate with Durham in any meaningful way was impeding her from doing her job to protect Seacrest legally and financially.

115.    By his actions, Aspegren manifested a clear intent to force Durham to leave Seacrest.

116.    From his arrival at Seacrest, Aspegren waged a systematic campaign to ignore Durham, take away her responsibilities without telling her, exclude her from meetings she was supposed to attend, embarrass her publicly, ignore her suggestions and advice regarding employment matters, and sabotage her work.

117.     Aspegren went as far as to lie to two School Heads telling them that Durham said she wanted to leave Seacrest.

118.     All of the employees to whom Aspegren shifted Durham's responsibilities were substantially younger than Durham.

119.     Aspegren forced Durham to fire employees over Durham's protestations that the terminations could have legal consequences.

120.     By forcing Durham to take legally and ethically questionable employment actions, Aspegren knowingly put Durham in danger of having to answer for any liability on Seacrest's part.

121.      At the same time Durham was undergoing Aspegren's disparate and biased treatment, Durham was aware, in her capacity as Human Resources Director, that other older employees were becoming fearful of their jobs due to treatment by Aspegren similar to his treatment of Durham.

122.     For the 2020/2021 school year, Seacrest experienced 22.6% turnover which was substantially higher than prior years.  Forty-seven percent of that turnover were voluntary resignations attributable to distrust and dislike of Aspegren.  Fifty-eight percent of that turnover consisted of employees over the age of 50.

123.     Durham endured Aspegren's ignorance, rudeness, bullying and harassing behavior for over 15 months because she wanted to safeguard Seacrest employees and Seacrest itself.

124.     However, Aspegren persisted in trying to humiliate Durham into leaving including moving her office from the front of Administration to the back where she was less accessible to the School Heads and Staff.

125.     As a result of Aspegren's ongoing illegal, unethical and unfair actions towards Durham and others of similar senior status, coupled with the apathy of the BOT which ignored the evidence of Aspegren's ageism, Durham sought counselling for a time but, for her own mental health, resigned on July 13, 2021.

126.     Despite having provided Aspegren and the BOT with four pages of Aspegren's behavior and the risks he was creating for Seacrest, not one member of the BOT reached out to Durham after she resigned.

127.     Seacrest hired a replacement Human Resources Director nineteen years younger than Durham.

128.     Were it not for Aspegren's discriminatory actions and the BOT's condonation of Aspegren's behavior, Durham would have remained working at Seacrest until she retired.

129.     As a result of Seacrest's and Aspegren's discriminatory actions Durham has incurred damages including the following:

    a. Loss of compensation and benefits;

    b. Loss of ability to obtain comparable employment, salary and benefits;

    c. Pain and Suffering for Emotional Distress;

    d. Expenses for counseling for Emotional Distress; and

    e. Attorney Fees.

## COUNT II
## AGE DISCRIMINATION IN EMPLOYMENT
### (STATE)

130.     Durham incorporates herein by reference paragraphs 1 through 129 of this Complaint.

131.     Seacrest and Aspegren discriminated against Durham with respect to the terms, conditions and privileges of her employment because of Durham's age.

132.     Seacrest and Aspegren's specific acts of age discrimination against Durham include the following:

    a. A persistent campaign against Durham to force her to resign;

    b. Systematically transferring Durham's duties and responsibilities to younger employees with any notice to or discussion with Durham;

    c. Embarrassing Durham at meetings, in public, and in group emails;

    d. Relocating Durham to an office less accessible to Staff;

    e. Treating Durham as if she did not exist;

    f. Undermining the trust that Durham had established with her team and other Seacrest staff;

    g. Undermining the professional reputation that Durham had established with her team and other Seacrest staff;

    h. Ignoring Durham's concerns and complaints about personnel practices and legally risky employment actions including potential age discrimination claims by other employees;

    i. Forcing Durham to take actions which would reflect upon her negatively;

    j. Excluding Durham from key meetings;

    k. Ignoring Durham's repeated complaints and warnings to Aspegren and Chair O'Hara about illegal and discriminatory actions by Aspegren and BOT member John Paz;

    l. Stating to members of Senior Staff that Durham wanted to leave Seacrest immediately when Durham had never insinuated or expressed such an intention; and

    m. Effectively stripping from Durham the authority to perform her job and protect Seacrest.

133.    As a result of Seacrest's and Aspegren's discriminatory and intolerable treatment of Durham and others whom she was charged to protect, Durham sought mental health counseling and, eventually, was forced to resign from Seacrest to protect her mental health.

134.    After Durham left Seacrest, Seacrest hired a Human Resources Director substantially younger than Durham.

135.    As a result of Seacrest's and Aspegren's discriminatory actions, Durham incurred damages as set forth in Compl. par. 129.

**COUNT III**
**RETALIATION**

136.    Durham incorporates herein by reference paragraphs 1 through 135 of this Complaint.

137.    On numerous occasions, Durham made written and oral complaints about Aspegren's ageist and other discriminatory behavior towards herself and other employees.

138.    For each complaint raised by Durham, there was a retaliatory response by Aspegren.

139.    In April 2020, Durham complained to Chair O'Hara about Aspegren's refusal to communicate with Durham about human resources, facilities or budget matters.  In May 2020, without any discussion with, or notice to, Durham, Aspegren promoted the facilities employee who had been one of Durham's direct reports, to Facilities Manager and instructed the employee not to report, or say anything, to Durham.

140.    On June 10, 2020, Durham expressed her concerns to Chair O'Hara about Aspegren's non-communication and the potential legal claims which could be brought against Seacrest due to Aspegren's legally questionable actions.  When, as directed by Chair O'Hare, Durham attempted numerous times to discuss her concerns with Aspegren, he avoided and refused all of Durham's attempts to meet or talk and, essentially, ignored her.

141.    Thereafter, in June 2020, without conducting any interviews and ignoring applications for the positions of Heads of the Upper, Middle and Lower Schools, Aspegren announced his unilateral decision to promote three existing employees to these senior leadership positions, without any discussion with, or notice to Durham, whose job included recruiting and hiring.

142.    In July 2020, Durham advised Aspegren that additional conclusory mold-testing should be conducted before opening up the Portables to Teachers and Students.  Although Aspegren ignored Durham's advice, Aspegren increased his public display of animosity towards Durham.  For example, in August 2020, Aspegren embarrassed Durham by telling her to stop talking in a New Employee Orientation Durham was conducting.

14

143.     In October 2020, Seacrest lost a viable and qualified senior candidate for the open College Counselor position due to disparaging remarks made by Aspegren when interviewing the candidate.  Durham reached out to Chairman O'Hara to express concerns about Seacrest losing promising candidates and valuable employees due to Aspegren's behavior and discriminatory practices and Durham's concern that Aspegren was putting Seacrest at risk for employment claims.

144.     Thereafter, on October12, 2020, Durham learned from a third party that Aspegren announced he was taking over the College Counselor search, which was Durham's responsibility, historically, as the Human Resources Director.

145.     After Aspegren was appointed the Permanent Head of School, over Durham's objections and warnings, Aspegren publicly called Durham an "Idiot" because of FMLA leave that she granted to an employee who was legally entitled to FMLA relief due to COVID, and refused all attempts by Durham to explain why, by law, the employee was entitled to FMLA leave.

146.     In March 2021, Durham, in a Confidential Memo, alerted Aspegren and Chair O'Hara to two complaints raised by a Seacrest employee against BOT member Paz alleging racially discriminatory behavior and harassment at a Seacrest fundraising event.  The incidents had been witnessed by other staff members, parents and guests.  Durham advised in her memo that certain efforts should be pursued with respect to the employee who sought help and BOT member Paz.

147.     Although the claims, complaints and warnings submitted by Durham to Aspegren and Chair O'Hara were ignored, the harassing, discriminatory, vindictive and demeaning treatment of Durham by Aspegren increased.

148.     In April 2021, Aspegren attempted to spread a false rumor that Durham wanted to leave Seacrest before the school year completed.  Had the false rumor spread, many of Seacrest's Staff would have lost trust and confidence in Durham and stopped coming to her for workplace issues.

149.     On May 25, 2021, Aspegren ordered Durham to fire a 59-year-old Asian/ Indian teacher based on one parent's complaint.  On May 26, 2021, Durham submitted a written memo to Aspegren, the Head of Upper School and the CFO, advising that due to fairness and employment discrimination considerations, Aspegren should conduct an investigation before making a decision to terminate the "accused" teacher.

150.     The same day, after receiving Durham's cautionary memo, Aspegren sent a group text to the Management Team reprimanding Durham for hiring a Science Teacher and telling Durham that she should not be making employment offers, which was Durham's job.

151.    Also, thereafter, Aspegren re-scheduled a May 2021 Leadership Meeting Durham was supposed to attend and deliberately omitted Durham from the Invite List so she missed the meeting.

152.    On June 4, 2021, Aspegren informed Durham that Aspegren was moving Durham to an office away from the front of Administration to an office less accessible to staff, despite complaints by Senior Staff that the move made Durham less accessible to Senior Staff.

153.    Also, on June 4, 2021, Aspegren deliberately deleted Durham's name from an upcoming Leadership Meeting Invite.

154.    On June 24, 2021, Aspegren ordered Durham to fire a Black Haitian Female who Durham had just hired as the Administrative Head of the Upper School with the approval of the Head of Upper School even though, historically, the Head of School, including Aspegren, had never been involved in hourly staff hiring decisions.

155.    The order to fire a New Hire was an affront and humiliation to Durham who hired a candidate in the necessary time, under budget and with qualifications that mirrored the Job Description created by the Upper School Leadership Team.

156.    Each and every one of the memos, complaints, concerns and suggestions that Durham submitted to Aspegren and Chair O'Hara related to behavior by Aspegren which put Seacrest at risk of exposure for legal claims related to age, race, and national origin discrimination and other unfair employment and safety-related issues.

157.    Aspegren's vindictive and retaliatory actions against Durham for engaging in legally protected activity created such intolerable and egregious work conditions that Durham sought mental health counseling in order to cope with and endure Aspegren's hostile treatment.

158.    On July 13, 2021, unable to further endure Aspegren's retaliatory, discriminatory and abusive practices at the expense of her own career and mental health, Durham was forced to resign from Seacrest after 21 years of dedicated, quality, service to an organization that, but for Aspegren's abusive, retaliatory, and illegal conduct, Durham would have remained loyal to until her chosen retirement day.

159.    As a direct result of Seacrest's and Aspegren's retaliatory treatment, Durham incurred damages including the damages listed in Compl. par. 129.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

160.    Durham incorporates herein by reference the allegations set forth in Compl. pars 1 through 159.

161.     As Head of School, Aspegren was Durham's direct supervisor with the authority to fire and discipline Durham.

162.     For 15 months, Durham endured Aspegren's bullying and abusive behavior which included the following:

   a.  Systematically stripping Durham of her responsibilities as Director of Operations;
   b.  Undermining Durham's authority over her own staff and her responsibilities as Human Resources Director;
   c.  Ignoring Durham's request for meetings to discuss personnel and employment issues;
   d.  Ignoring Durham's warnings and advice regarding potentially risky and illegal employment practices;
   e.  Intentionally excluding Durham from Leadership Meetings and key personnel decisions;
   f.   Making unilateral and legally risky promotion and appointment decisions without any consultation with Durham;
   g.  Forcing Durham to execute employee terminations that were potentially illegal, knowing that Durham, as Human Resources Director, would ultimately bear the brunt of any ensuing legal action;
   h.  Publicly embarrassing Durham in front of students and staff, in meetings and in group emails;
   i.   Laughing at Durham when she raised concerns about Aspegren supervising his ex-wife and the unfettered control Aspegren and his ex-wife wielded over financial and budgetary matters;
   j.   Attempting to spread a rumor that Durham wanted to leave Seacrest mid-school year;
   k.  Forcing Durham to move to a remote office less accessible to Staff; and
   l.   Rendering Durham essentially ineffective as a member of Seacrest's Senior Leadership Team despite her long tenure and loyalty to Seacrest and the trust and respect she had garnered.

163.     Aspegren's actions and his behavior towards Durham was an intentional campaign to force Durham to resign.

164.     The BOT was aware of how Aspegren's vindictive and intentional behavior was affecting Durham personally and impeding Durham's ability to do her job to protect Seacrest from unnecessary legal claims, yet took no action, not even an investigation into the claims and concerns Durham was raising about Aspegren.

165.     As Human Resources Director, Durham was aware of the distrust and discontent that spread through Seacrest's staff, especially older and minority employees as a result of their fear of being replaced with someone younger or of Caucasian ethnicity.

166.     Durham agonized over the fact that in the 2020/2021 school year, Seacrest lost 19 employees, 10 who left because of Aspegren and over 50% over the age of 50.

167.     Durham constantly worried about what Aspegren was doing to Seacrest. She couldn't sleep, was anxious, constantly feared for her job as well as the employment of other employees at Seacrest, and, eventually, sought mental health counseling to help her endure Aspegren's abusive and harassing treatment for the sake of Seacrest and its employees.

168.     By July 2021, the toxic and volatile environment Aspegren was creating at Seacrest, coupled with Aspegren's outrageous behavior towards Durham and the BOT's apathy with respect to the risks being created by Aspegren, were more than Durham, or any reasonable person, could tolerate.

169.     Because of her role as Director of Human Resources, Durham agonized and suffered not only for how she was being treated, but also for the Seacrest employees who put their trust in Durham.

170.     On July 13, 2021, Durham submitted a four-page Resignation Letter to Aspegren and the BOT outlining all of Aspegren's actions which contravened employment laws and fair and ethical practices, and the retaliation Durham suffered as a result of trying to keep Seacrest as risk-free as possible with respect to legal claims.

171.     As a result of the outrageous and intolerable treatment by Aspegren, ignored by the BOT, Durham has continued her mental health counselling to address her humiliation, lack of esteem, loss of career, and loss of professional trust and reputation all directly caused by Aspegren's intentional, outrageous conduct.

172.     As a result of her treatment by Aspegren, Durham has suffered and continues to suffer severe emotional distress for which she continues to seek counselling.

173.     In addition to the pain and suffering Durham has endured and continues to endure, she has also incurred fees for mental health counselling which are not covered by insurance.

174.     But for Aspegren's outrageous campaign to force Durham to resign, she would have remained at Seacrest, an organization Durham loved and protected with all her ability, until her retirement.

## COUNT V
## NEGILIGENT HIRING

175.     Durham incorporates herein by reference paragraphs 1 through 174 of this Complaint.

176.     It is the responsibility of Seacrest's BOT to search for and select Seacrest's Head of School.

177.     The BOT's fiduciary duties and responsibilities to Seacrest include making decisions within their authority that are in the best interest of Seacrest and to avoid actions detrimental to Seacrest and its employees.

178.     When the BOT hired Aspegren as the Interim Head of School it was with the agreement and understanding that the BOT would conduct a national search for a Permanent Head of School, which search was in the best interest of Seacrest.

179.     The BOT hired Aspegren as the Interim Head of School without conducting any employer or personnel reference checks on Aspegren except for a general criminal background check.  Upon information and belief, the BOT did not contact Aspegren's previous employer.

180.     Had the BOT conducted even a cursory investigation of Aspegren before hiring him as Interim Head of School, the BOT would have been alerted to the fact that Aspegren separated from his previous employer due to allegations that Aspegren raised the salaries of the Fundraising Staff there while budget restrictions had been imposed for staff with direct student contact; the exact same inequity Aspegren imposed at Seacrest.

181.     Despite numerous complaints by Staff and concerns raised by Durham as the Human Resources Director responsible for employment law compliance, the BOT hired Aspegren as the permanent Head of School without ever conducting any investigation of the concerns raised by Durham or reference checks on Aspegren, and without ever initiating the national search the BOT agreed upon when Aspegren was hired as the Interim Head of School.

182.     Neither before Aspegren was hired as the Interim Head of School, nor before Aspegren was hired as the Permanent Head of School, did the BOT evaluate Aspegren's fitness for management and leadership at Seacrest.

183.     Prior to hiring Aspegren as the Permanent Head of School, the BOT had more than enough evidence to, at the very least, conduct an investigation into complaints raised about Aspegren's bias against older workers and minorities and his abusive behavior towards Durham.

184.     Before hiring Aspegren permanently, the BOT was aware of actions by, and complaints against, Aspegren including the following:
   a. Aspegren's mass termination of Durham's maintenance team half of which were over 50 years old.
   b. The fact that Aspegren made the decision to fire Durham's entire staff without ever talking to Durham or warning her that the terminations were coming.  Aspegren did not even copy Durham on the group email Aspegren sent to Durham's staff firing them;
   c. The fact that Aspegren, again, without any prior discussion with, or notice to, Durham, promoted a 46-year-old facilities employee on Durham's staff to Facilities Manager and told him not to say anything to Durham;

19

d. The fact that Aspegren decided, unilaterally, to strip Durham of all of her responsibilities as Director of Operations and mostly ignored her in her capacity as Human Resources Manager;

e. The fact that Aspegren, unilaterally, without any discussion with Durham (who was in charge of Recruiting and Hiring in conjunction with Senior Management), without conducting any interviews, and ignoring more experienced, qualified and respected senior candidates, appointed three Heads of School who were substantially younger, less qualified and less experienced than numerous other choices;

f. The fact that Aspegren left a derogatory note on his door directed to the Hispanic cleaning crew;

g. The fact that Aspegren embarrassed Durham in a meeting she was conducting and rudely told her to stop talking;

h. The BOT witnessed Aspegren stopping the Business Manager from reporting to the BOT her concerns about Seacrest financial matters;

i. The fact that Aspegren's conduct in an interview with a candidate lost Seacrest a viable and talented Candidate for College Counselor; and

j. The fact that after denying the Staff a Cost-of-Living raise, Aspegren gave his ex-wife a substantial raise in salary and allowed her to hire two employees, ignoring the more pressing staff and facilities needs Seacrest was experiencing.

185. On at least seven occasions prior to December 2020, Durham expressed her concerns to Chair O'Hare about Aspegren's abusive and biased behavior towards Durham as well as the risks to which Aspegren was exposing Seacrest.

186. Hiring Aspegren without conducting any background checks, reference inquiries, or contacting his former employer was a failure to use reasonable care on the part of the BOT and a breach of the duties the BOT owed to Seacrest and its employees.

187. Hiring Aspegren permanently, without so much as making an inquiry into Aspegren's fitness for Seacrest based upon the behavior he exhibited and risky employment decisions he made during his nine months as Interim Head of School, was negligent and a total disregard of duties the BOT owed to Seacrest and its employees.

188. As a result of the BOT's lack of reasonable care and blatant disregard of the facts in front of them, for fifteen months, Durham was forced to endure outrageous, harassing actions and behavior on the part of Aspegren, which he perpetrated intentionally against Durham in an effort to force her to resign.

189. Aspegren's calculated treatment of Durham, which Seacrest and the BOT ignored, caused Durham to suffer the loss of her career and its compensation, humiliation, loss of self-esteem, a perceived loss of the respect and trust of Seacrest employees, and a belief that she could do nothing to safeguard Seacrest and its employees from Aspegren's discriminatory and retaliatory conduct.

## COUNT VI
## NEGLIGENT RETENTION

190.　　Durham incorporates herein by reference paragraphs 1 through 189 of this Complaint.

191.　　The BOT has the authority to hire, fire and discipline Seacrest's Head of School.

192.　　The BOT has a duty to Seacrest to ensure that Seacrest is not put at risk for illegal discriminatory practices.

193.　　The BOT has a duty to Seacrest's employees to ensure that they will not be subject to illegal discriminatory practices and/or illegal retaliation.

194.　　Despite the plethora of claims and cautions of which the Board was aware (see Compl. par 184), in December 2020, without the required due diligence customary for Senior Level Management and Leadership positions, and without conducting the intended national search for Head of School, the BOT hired Aspegren as the Permanent Head of School.

195.　　After he was hired as Permanent Head of School, Aspegren bore forward continuing his illegal discriminatory and retaliatory behavior which included the following:
   a. Aspegren's unilateral decisions to overlook or terminate older workers or subject them to illegally disparate treatment;
   b. Aspegren's preference for younger and less qualified candidates and employees over older, more experienced and qualified candidates and employees;
   c. Aspegren's animosity towards certain ethnic backgrounds;
   d. Aspegren's deliberate and repeated actions and attempts to embarrass Durham publicly, impede her ability to perform her job responsibilities, undermine Durham's professional credibility and reputation, weaken the Staff's trust in her, and systematically, transfer Durham's authority and responsibilities to younger employees;
   e. Aspegren's continued refusal to correct or address any claims that his actions might be perceived as ageist, discriminatory, or preferential treatment;
   f. Aspegren forcing Durham to execute employee terminations that Durham believed were discriminatory; and
   g. Serial acts of retaliation each time Durham raised concerns and complaints about the potential legal consequences of Aspegren's behavior and/or decisions.

196.　　After Aspegren's permanent hire, Durham continued to alert Aspegren and Chair O'Hara to potential legal risks Aspegren was creating and the continued and increased abuse and harassment Durham was suffering from in retaliation for her doing her job in advising and alerting Aspegren and the BOT to the potential legal consequences of Aspegren's actions.

197.    Seacrest and Chair O'Hara failed to take any steps to investigate Aspegren's actions, evaluate any legal risk for Seacrest created by Aspegren's actions and biases, or address, let alone correct, the intolerable work conditions to which Durham was subject.

198.    Based upon the number of detailed complaints Durham registered against Aspegren, Seacrest and Chair O'Hara knew or should have known that Aspegren was acting illegally and intentionally to cause severe emotional distress to Durham.

199.    Based upon the number of detailed complaints Durham registered against Aspegren, Seacrest and Chair O'Hara knew or should have known that Aspegren was deliberately putting Durham in a position where she had no choice but to resign.

200.    As a direct result of Seacrest's and Chair O'Hara's failure to curb or eliminate Aspegren's calculated and deliberate behavior that was imposing outrageous and intolerable work conditions on Durham, she sought mental health counselling to help her cope with the anxiety, sleeplessness, fears for her job and others, and feelings of inadequacy that she was experiencing.

201.    In the end, due to Aspegren's intentional, deliberate, systematic scheme to undermine, humiliate and harass Durham, she resigned via a lengthy letter to Aspegren and the BOT detailing, among other things, what she experienced at the hand of Aspegren.

202.    To this day, Durham has never received an inquiry or response from Chair O'Hara or any member of the BOT to her Resignation Letter.

203.    Seacrest and Chairman O'Hara acted negligently by allowing Aspegren to continue to act, unchecked, in all matters related to Personnel, Employee Recruitment, Hiring and Firing, Management of Senior Staff, and Facilities, Budget and Finances, notwithstanding the overwhelming number of alleged incidents that occurred during Aspegren's tenure related to his perceived preferential treatment, discrimination, bias, vindictive behavior, and financial autonomy.

204.    As a result of the BOT's lack of reasonable care and blatant disregard of the facts in front of them, for fifteen months, Durham was forced to endure outrageous, harassing actions and behavior on the part of Aspegren, which he perpetrated intentionally against Durham in an effort to force her to resign.

205.    Aspegren's calculated treatment of Durham, which Seacrest and Chair O'Hara ignored, caused Durham to suffer the loss of her career and its financial benefits, humiliation, loss of self-esteem, a perceived loss of the respect and trust of Seacrest employees, and a belief that she could do nothing to safeguard Seacrest and its employees from Aspegren's discriminatory and retaliatory conduct.

## **PRAYER FOR DAMAGES**

206.     For Durham's ADEA and FCRA Age Discrimination and Retaliation Claims Durham seeks damages including the following:

    a.  Compensation for lost wages, benefits and other remuneration she lost as a result of Defendants' actions;

    b.  Reimbursement of Attorney Fees; and

    c.  Any other compensatory damages allowable at law.

207.     For Durham's Claims of Intention Infliction of Emotional Distress and Negligent Hiring and Retention, Durham seeks damages including the following:

    a.  Compensation for the pain and suffering she endured as a result the emotional distress she suffered;

    b.  Compensation for lost wages, benefits and other remuneration;

    c.  Compensation for the expenses she incurred, and continues to incur, as a result of the emotional distress she suffered;

    d.  Reimbursement of Attorney Fees; and

    e.  Any other compensatory damages allowable at law.

## **JURY DEMAND**

Plaintiff hereby demands a Jury Trial on all issues so triable.

Respectfully Submitted,

Kim M. Hastings, Fl. Bar No. 698253
KIM M. HASTINGS, PLLC
23241 Marsh Landing Blvd.
Estero, FL  33928
Tel:  239-272-7883
e-mail:  kmhastings@kmhlegal.com

Attorney for Plaintiff